FILED

08/20/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0291

DA 23-0291

IN THE SUPREME COURT OF THE STATE OF MONTANA

2024 MT 179

WILFRED L. DOLL and CHERI L. DOLL,

        Plaintiffs, Counter Defendants,
        Appellees, and Cross Appellants,

    v.

LITTLE BIG WARM RANCH, LLC,
LARRY H. SMITH and MARK FRENCH,

        Defendants, Counter Plaintiffs,
        and Appellants.

---

LEVI DOLL and SHEILA DOLL,

        Intervenors.

APPEAL FROM:    District Court of the Seventeenth Judicial District,
                  In and For the County of Phillips, Cause No. DV-2018-06
                  Honorable Yvonne Laird, Presiding Judge

COUNSEL OF RECORD:

    For Appellants:

        Hertha L. Lund, Lund Law, PLLC, Bozeman, Montana

        Gregory G. Pinski, Conner, Marr & Pinski, PC, Great Falls, Montana

    For Appellees:

        L. Randall Bishop, L. Randall Bishop, AAL, Kalispell, Montana

        Monica J. Tranel, Tranel Law Firm, P.C., Missoula, Montana

Submitted on Briefs:  May 1, 2024

Decided:  August 20, 2024

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1      Little Big Warm Ranch, LLC (LBWR), appeals a summary judgment order from the Seventeenth Judicial District Court, Phillips County, which ruled that Wilfred L. Doll and Cheri L. Doll (Dolls) dissociated from LBWR in 2018.[1]

¶2      Dolls cross-appeal an adverse, contemporaneous summary judgment ruling from the same District Court that led to a verdict and judgment awarding LBWR compensatory and punitive damages.

¶3      We affirm in part and remand to the District Court to modify its judgment to exclude punitive damages.

¶4      We restate the issues on appeal as follows:

> *Issue One: Did the District Court err in ruling that Dolls dissociated from LBWR in 2018?*
>
> *Issue Two: Did the District Court err by applying the eight-year statute of limitation for contracts to LBWR's counterclaims?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶5      LBWR and Dolls have been litigating various issues since late-2017.  Generally, the issues have involved the formation and fallout of a business relationship that was designed to manage scarce water rights in Phillips County, which themselves have been the subject of litigation since the early 1990s.[2]

---

[1] Wilfred Doll's son and daughter-in-law, Levi Doll and Sheila Doll, intervened in this matter in the same interest as their parents.  Both the parents and children are hereinafter referred to collectively as "Dolls."

[2] *See Doll v. Knudsen*, No. DV-91083, 1992 Mont. Dist. LEXIS 397 (Mont. Seventeenth Jud. Dist. 1992).

¶6     We have previously ruled on two appeals between LBWR and Dolls.  In December 2018, we affirmed a Water Court order denying LBWR's petition to reopen Dolls' closed water rights claims, which had previously been adjudicated and settled.  *Little Big Warm Ranch, LLC v. Doll*, 2018 MT 300, 393 Mont. 435, 431 P.3d 342 (*Little Big Warm I*).  More recently, we affirmed a district court order enforcing LBWR's and Dolls' water rights in Big Warm Creek and denying Dolls fees and costs.  *Little Big Warm Ranch, LLC v. Doll*, 2024 MT 3, 415 Mont. 8, 541 P.3d 104 (*Little Big Warm II*).

¶7     The present litigation proceeded in parallel with the water rights dispute and culminated in a $2.5 million jury verdict for LBWR finding that Dolls were liable for breach of fiduciary duties and the obligation of good faith and fair dealing to LBWR.  The District Court ordered Dolls to pay LBWR for their damages at an 11.25% interest rate per year until paid in full.  Further, the District Court ordered LBWR to distribute Dolls' shares in LBWR to them for the "fair value price of $434,000 at a 7.5% interest rate which began to accrue on February 2, 2018."

¶8     The parties appeal various rulings underpinning the District Court's judgment.  Because several prongs of litigation co-evolved, we recount the relevant details in chronological order for clarity.

¶9     Through the 1990s, Dolls were involved in two water rights disputes with Steve and Lori Knudsen (Knudsens) over rights to water in Big Warm Creek, Ester Reservoir, Little

Warm Creek, and Little Warm Reservoir.[3]  The cases were certified to the Water Court, where they were adjudicated and published in draft water master's reports.

¶10    Knudsens' successors-in-interest, James Dudley and Leslie Greene (Greenes) objected to Dolls' rights during the water right adjudication process.   Before their objections were resolved, in 2013, Greenes sold the property to Carthel "Jack" Finch, W.G. Dement, and Jason Dement (Finch/Dements).

¶11    In November 2014, several families and neighbors with mutual interests in Phillips County formed LBWR "for the purpose of operation and management of farm and ranch real estate and any and all lawful related or incidental business activities."

¶12    On November 10, 2014, LBWR members, including Dolls, signed an operating agreement (Operating Agreement) which, among other provisions typical of a business operating agreement, provided a formula for valuing members' shares, procedures for dissociating members, and procedures for dissolving and "winding up" the business. Dolls bought two of fifteen total member shares for $265,000 each.

¶13    Between November and December 2014, LBWR negotiated to purchase the Finch/Dement property.  The buy-sell agreement included first priority appurtenant water rights.

¶14    While negotiations between LBWR and the Finch/Dements were underway, Dolls began separately negotiating a settlement agreement (Settlement Agreement) with the Finch/Dements regarding the Greenes' previous objections to Dolls' water rights.   The

---

[3] *Doll v. Knudsen*, No. DV 93-50 (Mont. Seventeenth Jud. Dist. 1992); *Doll v. Knudsen*, No. DV 95-031 (Mont. Seventeenth Jud. Dist. 1995).

5

Settlement Agreement provided Dolls with senior water rights and effectively devalued the Finch/Dement property. LBWR would have otherwise acquired the most senior rights.

¶15 It is not disputed that Dolls threatened to withhold a $300,000 deposit on the Finch/Dement property purchase pending LBWR members' signatures on an acknowledgment of the Settlement Agreement. The parties dispute when the other LBWR members gained actual knowledge of the terms of the Settlement Agreement. There is no dispute, however, that Dolls failed to notify them that the water rights granted to Dolls under the Settlement Agreement conflicted with LBWR's loan application for the Finch/Dement property, which provided as security "1st water rights. Source is Ester Lake and Little Big Warm Lake," and which Dolls signed.

¶16 LBWR members signed the acknowledgment, thereby consenting to Dolls' consequent senior priority water rights on December 11, 2014, the same day that it closed on the Finch/Dement property. The Settlement Agreement was executed on December 23, 2014.

¶17 On November 29, 2017, LBWR petitioned the Water Court to reopen Dolls' claims and substitute itself for Greenes as objectors. Although the claims were closed more than two years prior,[4] LBWR alleged that its Due Process rights were violated when Dolls failed to provide sufficient notice of the Settlement Agreement. LBWR argued that it could not adequately protect the water rights appurtenant to the Finch/Dement property having

---

[4] LBWR had previously moved to substitute itself for the Knudsens in DV-1993-50 and DV-1995-31. On March 26, 2015, on LBWR's motion, the cases were dismissed without prejudice because LBWR and Dolls had "settled the matters at issue."

6

learned about the Settlement Agreement and Dolls' senior rights just before its members closed on the transaction.

¶18 On January 8, 2018, at an annual meeting, LBWR passed amendments to the Operating Agreement, which would impose assessments for litigation fees and costs and allow LBWR to terminate the membership of an adverse member. The members also voted to show support for LBWR's proceeding before the Water Court. Dolls voted against the amendments.

¶19 On January 29, 2018, the Water Court rejected LBWR's petition to reopen Dolls' claim, concluding that LBWR failed to timely substitute itself for the Greenes in their objections to Dolls' water rights. LBWR subsequently appealed that ruling to this Court.

¶20 On January 30, 2018, Dolls filed a District Court complaint in this proceeding seeking an injunction prohibiting action on the Operating Agreement amendments and alleging certain members violated their duty of loyalty, duty of care, and obligation of good faith and fair dealing in their business dealings with Dolls. Among their requests for relief, Dolls asked for "an order dissolving the ranch or alternatively for a distribution and/or purchase of the Dolls' interest in [LBWR]."

¶21 On February 16, 2018, LBWR convened a board meeting that was scheduled, in part, to ratify minutes from the January 8, 2018 meeting. When they learned that Dolls' counsel was present at the meeting remotely, LBWR members voted to adjourn the meeting. All members, excluding Dolls, reconvened the meeting moments later and voted to "update and publish . . . [Amendments] passed at the Annual Meeting 1.8.18, to be included in the Operating Agreement and By-Laws of [LBWR]."

7

¶22 On December 11, 2018, this Court affirmed the Water Court order denying LBWR's request for substitution and motion to reopen Dolls' claims. *Little Big Warm I*, ¶ 15. In the appeal, LBWR again argued that it did not have notice of an opportunity to substitute itself for Greenes as objector to Dolls' water rights. *Little Big Warm I*, ¶ 15. We affirmed the Water Court's conclusion that LBWR had notice and even participated in the Dolls' proceedings with the Greenes, which was reflected by LBWR's consent to the Settlement Agreement resolving the Greenes' objections. *Little Big Warm I*, ¶ 17.

¶23 On January 15, 2019, LBWR filed counterclaims in the District Court proceeding against Dolls related to the Settlement Agreement. LBWR alleged it was entitled to compensatory and punitive damages for fraud, deceit, tortious interference with contract, unjust enrichment, and breach of the duty of loyalty, the duty of care, and the obligation of good faith and fair dealing. LBWR additionally sought declaratory judgment that it was not bound by the Settlement Agreement.

¶24 On April 23, 2021, the District Court denied the Dolls' summary judgment motion on LBWR's counterclaims alleging breach of the duty of care, duty of loyalty, and the obligation of good faith and fair dealing. The District Court ruled those claims survived summary judgment because they were rooted in the Operating Agreement, thus the eight-year statute of limitation for contracts applied. The District Court granted Dolls summary judgment on all of LBWR's other claims.

¶25 On May 28, 2021, the District Court granted LBWR summary judgment on its counterclaims alleging Dolls breached the duty of care, duty of loyalty, and the obligation of good faith and fair dealing. The District Court determined that Dolls were liable as a

8

matter of law because it was undisputed that their tortious conduct resulted in a breach of their fiduciary duties and obligation of good faith and fair dealing to LBWR. Other than Dolls' remaining claims, only the issue of damages remained for jury trial.

¶26 At LBWR's January 4, 2023 annual meeting, a 75-percent majority of its members determined the fair value of its member shares was $434,000 per share. The figure was calculated by subtracting LBWR's total debt from a full appraisal value determined by an appraiser selected by LBWR's accountant.

¶27 An eight-day jury trial was held between January 26 and February 4, 2023. The jury was tasked with resolving (1) Dolls' claims against LBWR, and (2) the damages award for Dolls' breach of fiduciary duties and the obligation of good faith and fair dealing. During a discussion regarding jury instructions, Dolls objected to the inclusion of punitive damages because of "the fact that [LBWR is] here on a contract claim, by law they are precluded from punitive damages." The District Court reasoned that our decision in *Romo v. Shirley* allows for punitive damages in a contract case given "a tort and a contract claim arising alongside each other." 2022 MT 249, ¶¶ 13-19, 411 Mont. 111, 522 P.3d 401.

¶28 On February 4, 2023, a unanimous jury found LBWR was not liable to Dolls for breach of the duty of care, duty of loyalty, and the obligation of good faith and fair dealing. The jury determined that Dolls, on the other hand, breached their duty of care, duty of loyalty, and obligation of good faith and fair dealing, and awarded LBWR $2.42 million in compensatory damages, and $80,000 in punitive damages.

¶29 On April 21, 2023, the District Court granted Dolls summary judgment on its petition for dissolution. However, the District Court denied dissolution, ruling that Dolls

9

had dissociated from LBWR on February 2, 2018, the date they filed the complaint seeking dissolution of LBWR and a distribution of their shares.[5]

¶30 On May 25, 2023, the District Court entered final judgment and ordered Dolls to pay $2.5 million to LBWR with 11.25% interest until paid in full. Further, the District Court ordered LBWR to pay Dolls $434,000 for each of their two shares with 7.5% interest that began accruing on February 2, 2018.

**STANDARD OF REVIEW**

¶31 We review a district court's summary judgment rulings de novo, applying the same criteria as the district court. *Citizens for a Better Flathead v. Bd. of Cnty. Comm'rs*, 2016 MT 325, ¶ 14, 385 Mont. 505, 386 P.3d 567. Summary judgment is appropriate when no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. *Renenger v. State*, 2018 MT 228, ¶ 6, 392 Mont. 495, 426 P.3d 559.

¶32 We review a district court's factual findings for clear error, and the legal conclusions drawn therefrom for correctness. *Merila v. Burke*, 2024 MT 4, ¶ 11, 415 Mont. 24, 541 P.3d 770. A factual finding is clearly erroneous if it is not supported by substantial evidence, if the trial court misapprehended the effect of the evidence, or if this Court is left with the definite and firm conviction that a mistake was made. *Skelton Ranch, Inc., v. Pondera Cnty. Canal & Reservoir Co.*, 2014 MT 167, ¶ 27, 375 Mont. 327, 328 P.3d 644.

---

[5] The District Court granted Dolls' petition for dissolution on summary judgment in March 2021. Upon LBWR's M. R. Civ. P. 52(b) motion to amend, the District Court rescinded the dissolution order because questions of fact remained around Dolls' exclusion from LBWR's February 16, 2018 meeting. The matter was outstanding until the District Court entered its April 21, 2023 order on dissolution.

**DISCUSSION**

¶33 *Issue One: Did the District Court err in ruling that Dolls dissociated from LBWR in 2018?*

¶34 LBWR asserts the District Court erred when it ruled that Dolls dissociated from LBWR on February 2, 2018, contending Dolls failed to provide notice of their intent to dissociate when they pleaded under a distinct set of dissolution statutes. LBWR avers that the District Court improperly conflated the dissociation and dissolution statutes in selecting the 2018 date, because Dolls were not dissociated until the District Court "judicially dissociated Dolls from LBWR" in its April 21, 2023 order on summary judgment. LBWR further argues that, because Dolls were still members when the amendments passed, it is entitled to attorney fees and costs based on the provisions LBWR added into the Operating Agreement on February 16, 2018.

¶35 Dolls counter that the February 2, 2018 dissociation date was proper because it reflects a holistic reading of LBWR's Operating Agreement, Dolls' pleadings, and the dissociation statutes, §§ 35-8-803-812, MCA. Dolls assert that they were not LBWR members on February 16, 2018, therefore they were not subject to the amended provisions providing for attorney fees and costs.

¶36 The Montana Limited Liability Company Act (MLLCA), Title 35, chapter 8, MCA, was adopted in 1993 and was later amended to "substantially follow the Uniform Limited Liability Company Act (1996)." *White v. Longley*, 2010 MT 254, ¶ 34, 258 Mont. 268,

11

244 P.3d 753. The MLLCA provides separate statutory frameworks for dissociation and dissolution under Parts 8 and 9, respectively.[6]

¶37 The dissociation statutes dictate that "a member has the power to dissociate from a limited liability company at any time, rightfully or wrongfully," § 35-8-804(1), MCA, provided one of the following occurs:

> *(a) the company's having notice of the member's express will to withdraw upon the date of notice or on a later date if specified by the member;*
> (b) an event agreed to in the operating agreement as causing the member's dissociation;
> (c) upon transfer of all of a member's distributional interest, other than a transfer for security purposes or pursuant to a court order charging the member's distributional interest that has not been foreclosed;
> (d) the member's expulsion pursuant to the operating agreement;
> (e) the member's expulsion by unanimous vote of the other members . . . .

Section 35-8-803(1), MCA (emphasis added).

¶38 The LBWR Operating Agreement, furthermore, stipulates that dissociation occurs when a member withdraws "by voluntary act," and establishes procedures that must be followed in the event of a dissociation, including buying out the member's shares pursuant to the following:

> If the Members did not determine a value of the Member's interest at the recent annual meeting, or the prior year's annual meeting, then the value for each of the membership interests in the Company shall be fixed at the Member's proportionate value of the appraised value of the real estate owned by the Company as determined by a real estate appraisal conducted by a real estate appraiser named by the Company's principal accountant.

---

[6] A "dissociation" is a "change in the relationships among the dissociated member, the company and the other members caused by a member's ceasing to be associated in the carrying on of the company's business." Section 35-8-803, MCA, Official Comments.

¶39 The dissolution statutes, by contrast, provide that a district court may order the dissolution of an LLC "on application by or for a member or a dissociated member," if any of the following events occur:

(a) the economic purpose of the company is likely to be unreasonably frustrated;
(b) another member has engaged in conduct relating to the company's business that makes it not reasonably practicable to carry on the company's business with that member remaining as a member;
(c) it is not otherwise reasonably practicable to carry on the company's business in conformity with the articles of organization and the operating agreement;
(d) the company failed to purchase the petitioner's distributional interest as required by 35-8-805; or
(e) the members or managers in control of the company have acted, are acting, or will act in a manner that is illegal, oppressive, fraudulent, or unfairly prejudicial to the petitioner.

Section 35-8-902(1), MCA.

¶40 LBWR argues on appeal that our pleading standards mandate reversal because Dolls failed to expressly request dissociation.

¶41 We require pleadings to contain "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Griffin v. Moseley*, 2010 MT 132, ¶ 39, 356 Mont. 393, 234 P.3d 869 (quoting *Spaberg v. Johnson*, 143 Mont. 500, 503, 392 P.2d 78, 80 (1964)).

¶42 Dolls provided LBWR with sufficient notice in their complaint, which specifically requested "an order dissolving the ranch or *alternatively* for a distribution and/or purchase of the Dolls' interest in [LBWR], and all other relief as the court may deem proper." (Emphasis added.) Notwithstanding Dolls' failure to cite Part 8 in their pleadings, Dolls specifically requested a buy-out as an alternative to dissolution, which is what the

13

Operating Agreement requires when a dissociation occurs. Practically, a "distribution and/or purchase of the Dolls' interest in [LBWR]," would only occur in the event of dissolution or dissociation. Given Dolls pleaded the request in the alternative to dissolution, we hold the pleading was sufficient to constitute both a "voluntary act" and a "short plain statement" of Dolls' "express will to withdraw," satisfying the terms of the Operating Agreement, § 35-8-803(1), MCA, and our notice pleading requirements. *Moseley*, ¶ 39.

¶43 Moreover, LBWR's own behavior belies their contention that there was insufficient notice. LBWR took proactive measures to exclude Dolls from participating in the business as early as February 16, 2018. After receiving Dolls' complaint, LBWR excluded Dolls from the February 16, 2018 meeting where LBWR would then ratify the Operating Agreement amendments providing authority to expel adverse members and seek attorney fees and costs. The fact that Dolls participated in the vote establishing the fair market value of member shares on January 4, 2023, does not undermine the fact that they had given notice of their intent to withdraw. If anything, it supports the District Court's conclusion because the withdrawal precipitated the valuation procedures.

¶44 The District Court did not improperly conflate the dissociation and dissolution statutes. The Official Comments to § 35-8-902, MCA, caution district courts against granting a dissolution "if the applicant member has the right to dissociate and force the company to purchase that member's distributional interest under [§§ 35-8-808 and -809]." This principle logically ensures that an LLC with the ability to function absent certain members is not improperly dissolved at the cost of other members' interests in the business.

14

The dissociation of certain members, however, does not necessarily bear on the business's viability to the same effect.[7]

¶45 LBWR's reliance on out-of-state precedent to support its argument is unavailing. *Nelsen v. Nelsen* involved an Idaho family-run farming business that began to fall apart when the parents effectively gifted one son a majority share. 170 Idaho 102, 508 P.3d 301 (2022). Interpreting the business's operating agreement in the context of Idaho law, the Idaho Supreme Court ruled that a family member was not automatically involuntarily dissociated from his family's LLC simply because he filed for dissolution. 170 Idaho at 135, 508 P.3d at 334. The *Nelsen* court found it significant that the aggrieved shareholder never pleaded for dissociation only because the district court ordered that the member was dissociated *involuntarily*. 170 Idaho at 135, 508 P.3d at 334. Dolls were never involuntarily dissociated, thus *Nelsen* is inapposite.

¶46 LBWR further contends that Dolls were not dissociated until the District Court granted Dolls summary judgment on their motion for dissolution. Under this theory, Dolls were not dissociated until April 23, 2023, thus LBWR would not be liable for any interest accrued since February 2, 2018, and Dolls would be subject to the terms of the amended

---

[7] LBWR does note that § 35-8-805(2)(a), MCA, and LBWR's Operating Agreement forbid a dissociated member from participating in business decisions. While that may be the case, it does not necessarily follow that a member's participation is proof of their intent *not* to dissociate and/or a corresponding pleading deficiency. LBWR certainly could have prohibited Dolls from participating in the February 28, 2023 meeting where LBWR established the fair market value of its shares, much as it did at the February 16, 2018 meeting where it ratified amendments to its Operating Agreement.

Operating Agreement and potentially liable for attorney fees and costs. This interpretation is unsupported by statute, and LBWR fails to cite any supportive precedent.

¶47 As LBWR correctly notes, its obligation to buy Dolls out was triggered "as of the date of the member's dissociation . . . [,]" § 35-8-808(1)(a), MCA, at which point LBWR had 30 days to pay Dolls. Section 35-8-808(2), MCA. After 120 days, Dolls were entitled to sue LBWR for the distribution. Section 35-8-808(4), MCA. The fact that Dolls did not commence an action to recover their shares' value after 120 days, however, has no bearing on whether they were legally dissociated. As discussed, "A member is dissociated from a limited liability company upon . . . notice of the member's express will to withdraw *upon the date of notice . . . .*" Section 35-8-803(1)(a), MCA (emphasis added). The District Court correctly determined the "date of notice" was February 2, 2018, when Dolls served their complaint.

¶48 *Brennan v. Brennan Assocs.* does not support LBWR's proffered April 21, 2023 dissociation date. 316 Conn. 677, 113 A.3d 957 (2015). On appeal to the Connecticut Supreme Court, a business partner contested the valuation method for a buy-out distribution after he had been involuntarily dissociated from the business. *Brennan*, 316 Conn. at 683-93, 113 A.3d at 962-68. The partner had already appealed the involuntary dissociation, thus the *Brennan* court ruled that the effective date of dissociation for valuing his share was the date of final judgment on appeal—not the date the district court originally ordered his involuntary dissociation. *Brennan*, 316 Conn. at 685-86, 113 A.3d at 963. The situation here does not involve an involuntary dissociation. Nor does it involve a subsequent appeal of the decision ordering it. LBWR's analogy to *Brennan* is misplaced.

16

¶49 Finally, the District Court correctly determined that the fair market value of LBWR's member shares was $434,000 for the purpose of buying-out Dolls. Dolls do not contest the District Court's valuation method on appeal. LBWR, however, argues that if Dolls were legally dissociated on February 2, 2018, then the District Court erred in appraising LBWR's property based on 2023 property values.

¶50 The District Court had discretion to "determine the fair value of the distributional interest in accordance with the standards set forth in [§ 35-8-809, MCA]." Section 35-8-808(5), MCA. In determining an appropriate value, a district court must consider "any agreement among some or all of the members fixing the price or specifying a formula for determining value of distributional interests . . . ." Section 35-8-809(1)(a), MCA. Here, the District Court appropriately considered that the Operating Agreement specifically requires that an appraiser conduct a *current* appraisal in determining a buy-out price when LBWR has not had its property appraised within the two preceding years. Moreover, the District Court equitably subtracted LBWR's debt from the fair market value—contrary to Dolls' petition for $666,666.67—and divided the figure by the total number of members to establish Dolls' fair member share at $434,000. This was the same figure that LBWR approved at its January 4, 2023 annual meeting.

¶51 Because LBWR's claim for contract fees and costs is predicated on reversing the District Court, we find no need to address the merits here. The District Court correctly determined that Dolls were dissociated from LBWR on February 2, 2018. Likewise, the District Court did not abuse its discretion in determining the fair market value of LBWR in calculating Dolls' distributional interest.

17

¶52     *Issue Two: Did the District Court err by applying the eight-year statute of limitation for contracts to LBWR's counterclaims?*

¶53     Dolls contend the District Court erred in its April 23, 2021 order denying them summary judgment on LBWR's counterclaims. Dolls assert that the law of the case mandates reversal because LBWR signed an acknowledgment of the Settlement Agreement before closing on the Finch/Dement property, which we affirmed in *Little Big Warm I*. Alternatively, Dolls contend that LBWR's claims alleging breach of the duty of care, duty of loyalty, and obligation of good faith and fair dealing "sound in tort," not contract, and thus the three-year statute of limitation for tort claims should have foreclosed LBWR's claims.

*Consent to a Breach*

¶54     At the outset, we reject Dolls' argument that LBWR's acknowledgment of the Settlement Agreement is dispositive.

¶55     The MLLCA establishes clear fiduciary obligations that LLC members must adhere to in carrying out their duties. A member's duty of loyalty requires them to "hold as trustee for [the business] any property, profit, or benefit derived by the member in the conduct of the company's business . . . ." Section 35-8-310(2), MCA. Likewise, a member's duty of care provides that members may not engage in "grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law." Section 35-8-310(3), MCA. Further, "A member shall discharge the duties under [] the operating agreement to a member-managed company and its other members and exercise any rights consistently with the obligation of good faith and fair dealing." Section 35-8-310(4), MCA.

18

¶56 Dolls do not dispute that they entered into a Settlement Agreement that devalued the Finch/Dement property. Nor do they dispute that they owed LBWR fiduciary duties. While Dolls were LBWR members, they negotiated for first priority water rights with the Finch/Dements and were not transparent about the impact the Settlement Agreement would have on LBWR's water rights until the day LBWR closed on the Finch/Dement property.

¶57 Dolls assert that they should not be held liable to LBWR for simply acting in their own interests by settling with the Finch/Dements. Section 35-8-310(5), MCA, provides that "A member of a member-managed company does not violate a duty or obligation under this chapter or under the operating agreement merely because the member's conduct furthers the member's own interest." The statute addresses the reality that not all of a member's personal interests are intertwined with a business, thus a member should not be held liable for actions advancing their own interests *as long as they do not come at the cost of the business*.[8] That is the situation here: the Settlement Agreement personally benefitted Dolls *and* harmed LBWR.

¶58 The District Court correctly determined that LBWR's consent to the Settlement Agreement did not constitute a waiver of claims alleging breach of fiduciary duties and the obligation of good faith and fair dealing.

---

[8] The Uniform Limited Liability Act (ULLA) subsection from which § 35-8-310(5), MCA, was adopted verbatim has since been omitted because "As a proposition of contract law, the language is axiomatic and therefore unnecessary. In the context of fiduciary duty, the language is at best incomplete, at worst wrong, and in any event confusing." Section 409, ULLA, Annotations. While the Montana Legislature has not repealed § 35-8-310(5), MCA, we, too, find it "unnecessary" and "confusing" applied in a context, like here, where a member's conduct furthers their own interest at the cost of fiduciary duties.

19

¶59 Despite Dolls' arguments to the contrary, *Payne v. Hall* does not "eliminate all doubt" about whether LBWR's knowledge of Dolls' breach should exempt them from liability. 2020 MT 46, 399 Mont. 91, 458 P.3d 1001. In that case, we affirmed the district court based on the fact that an otherwise applicable statute of limitation was not tolled for lack of notice when the claimant had imputed knowledge of a condition that materially altered the value of the subject property. *Payne*, ¶¶ 18-20. *Payne* involved the negotiation of a purchase agreement between independent parties. Here the facts are significantly different—involving breach of fiduciary duties between members of an LLC—and require a separate analysis. *Payne* is inapposite.

*Statutes of Limitation*

¶60 Dolls argue that LBWR's counterclaims sound in tort because their fiduciary duties to LBWR arose from statute, outside the ambit of the Operating Agreement and contract law. In support of their argument, Dolls note that LBWR's counterclaims only alleged violations of statute and failed to reference breach of the Operating Agreement.[9] LBWR responds that because Dolls' claims specifically alleged breach of fiduciary duties under the Operating Agreement, LBWR's analogous counterclaims stem from the same and thus sound in contract.

¶61 We hold that the District Court correctly determined that the eight-year statute of limitation for contracts applied to LBWR's counterclaims. The District Court erred,

---

[9] While LBWR's pleadings may have been inartful for their failure to allege breach of the Operating Agreement, the deficiency is not dispositive. Dolls do not object to the sufficiency of the pleadings.

however, in awarding punitive damages, which are not allowed for breach of contract actions. *See* § 27-1-220(2)(ii), MCA.

¶62 As a preliminary matter, we reject LBWR's contention that a statute of limitation does not apply to their counterclaims because they "aris[e] out of the transaction or occurrence that is the subject matter of the plaintiff's claim against the defendant." Section 27-2-408(1), MCA. Notwithstanding the fact that both sets of claims fundamentally arose from the Operating Agreement, they relate to distinctly different subject matter. Section 27-2-408(1), MCA, provides that "A defendant is entitled to assert against a plaintiff, by pleading or amendment, any counterclaim *arising out of the transaction or occurrence that is the subject matter of the plaintiff's claim against the defendant*." (Emphasis added.)

¶63 In *First Sec. Bank of Missoula v. Ranch Recovery Ltd. Liab. Co.* we ruled that a statute of limitation did not apply to counterclaims that arose from the same property transaction that gave rise to the plaintiff's original cause of action. 1999 MT 43, ¶ 35, 293 Mont. 363, 976 P.2d 956 (citing § 27-2-408(1), MCA). In a foreclosure action after the purchase and sale of a resort, the plaintiff bank argued a statute of limitation for tort claims applied to defendants' bad faith, fraud, and unconscionability claims. *First Sec.*, ¶ 33. We determined that § 27-2-408(1), MCA, permitted defendants' counterclaims because they related back to the same property transaction.

¶64 The distinction between this case and *First Sec.* is clear: Dolls' original claims related to entirely different subject matter than LBWR's counterclaims. Dolls alleged that other members "compromised, diluted and devalued" Dolls' interest by "filing litigation against Dolls seeking to re-open [the] water dispute," "rejecting funding for repair of Little

21

Warm dam," "failing to pay the Dolls for their capital contributions," and by "voting to amend the Operating Agreement in such a way that the Dolls are being squeezed out of the company." LBWR, by contrast, alleged a breach based on Dolls' settlement negotiations with the Finch/Dements.

¶65 The mere fact that a counterclaim is filed in a case does not mean it is exempt from applicable statutes of limitation. A counterclaim "must comply with the applicable statute of limitations" unless it is a defensive claim. *State ex rel. Egeland v. Cut Bank*, 245 Mont. 484, 490, 803 P.2d 609, 613 (1990). LBWR's claims were affirmative—not defensive—and related to entirely different subject matter than Dolls', thus a statute of limitation may apply.

¶66 The issue that remains, therefore, is whether the three-year statute of limitation for torts, or the eight-year limitation period for contracts applies. We hold that the eight-year limitation period applies.

¶67 The line between contract and tort can be thin. "The general rule applied to situations falling within the twilight zone of contract and tort law is that doubt must be resolved in favor of an action based upon contract." *Thiel*, 218 Mont. 201, 209-10, 710 P.2d 33, 38 (1985) (citing *Unruh v. Buffalo Bldg. Co.*, 194 Mont. 553, 633 P.2d 617 (1981)). Our analysis here thus begins in the same place as other cases inside the "twilight zone of contract and tort law"—by determining whether the essence of LBWR's claims is tortious or contractual. *Thiel*, 218 Mont. at 209, 710 P.2d at 38; *see also N. Mont. Hosp. v. Knight*, 248 Mont. 310, 314, 811 P.2d 1276, 1278 (1991). The MLLCA and caselaw indicate that the "essence" is contractual here.

22

¶68 The intent underlying the fiduciary duties provided by the MLLCA indicates that Dolls' fiduciary obligations to LBWR were inherently contract-based and could not exist without the Operating Agreement. Section 35-8-310(1)-(4), MCA, which establish causes of action for breach of the duties of loyalty, care, and the obligation of good faith and fair dealing, provide, in part:

> A member shall discharge the duties under this chapter *or the operating agreement* to a member-managed company and its other members and exercise any rights consistently with the obligation of good faith and fair dealing.

Section 35-8-310(4), MCA (emphasis added). The 1999 Legislature adopted this language verbatim from Section 409 of the ULLA. Although § 35-8-310(4), MCA, does not clearly state whether the causes of action the Section provides are inherently based in contract, its reference to "the operating agreement" suggests that the common law origins of the fiduciary duties owed a business by its members and managers at least complement the obligations inherent in an operating agreement. Annotations to Section 409 of the ULLA offer further insight:

> At first glance, it may seem strange to apply a contractual obligation to statutory duties and rights—i.e., duties and rights "under this [act]." However, for the most part those duties and rights apply to relationships *inter se* the members and the LLC and function only to the extent not displaced by the operating agreement. In the contract-based organization that is an LLC, those statutory default rules are intended to *function like a contract* . . . .

(Emphasis added.) The annotations both acknowledge the awkwardness of shoehorning common law duties into contract law and establish that the purpose of doing so is to make them "function like a contract."

23

¶69    The ULLA and MLLCA thus provide sideboards around how a business may expand or contract the fiduciary obligations owed by its members under an operating agreement. *See, e.g.,* § 35-8-109, MCA, Official Comments ("[A]n irreducible core of fiduciary responsibilities survive any contrary provision in the operating agreement."). For example, an operating agreement "may not . . . eliminate the duty of loyalty . . . but the agreement may . . . identify specific types or categories of activities that do not violate the duty of loyalty, if not manifestly unreasonable . . . ." Section 35-8-109(3)(b), MCA. Likewise, an operating agreement "may not unreasonably reduce the duty of care . . . ." Section 35-8-109(3)(c), MCA. These provisions indicate that the duties of loyalty and care under the MLLCA are ancillary to those inherent in an operating agreement, not separate from them.

¶70    Beyond the MLLCA, tort-based fiduciary duties may arise absent privity of contract when they are otherwise provided for by statute.[10] Tort liability can also form when the parties *are* bound by contract. *See Romo*, ¶ 13 ("[I]f a defaulting party, by breaching the contract, also breaches a duty which he owes to the other party independently of the contract, a party may assert a claim of liability in tort." (internal quotation omitted)). When contractual duties exist, it can be difficult to discern them from separate duties that exist in tort.

---

[10] *E.g., Kipfinger v. Great Falls Obstetrical & Gynecological Assocs.*, 2023 MT 44, ¶ 17, 411 Mont. 269, 525 P.3d 1183 (doctor/patient); *Thayer v. Hicks*, 243 Mont. 138, 793 P.2d 784 (1990) (accountant/third party); *see* § 28-1-201, MCA (codifying general duty of care).

¶71    In *Story v. Bozeman*, we opined on the inherent conflict between the "specter of tort damages"—often accompanied by lengthy trials and disparate damages awards—and the overarching goal of contract law: ensuring either efficient performance or breach. 242 Mont. at 448-49, 791 P.2d at 774-75 (1990). We asked whether a bad faith tort claim may be brought in a contract dispute, or if the claimant is limited to pursuing the claim under a breach of contract theory. *Story*, 242 Mont. at 445, 791 P.2d at 772. The problem that we addressed there was that the evidence typically required to prove moral wrongdoing and punitive damages in bad faith claims had expanded the scope of contract litigation wider than it should have been. *Story*, 242 Mont. at 448, 791 P.2d at 774. While we acknowledged that certain tort claims are contract-related—i.e., the torts of fraud, fraudulent inducement, and tortious interference with contract—ultimately, we held that "the bad faith tort should be used only when the parties have a special relationship," and further reasoned that "the great majority" of good faith and fair dealing claims *are* breach of contract claims. *Story*, 242 Mont. at 450, 791 P.2d at 775-76.

¶72    Dolls misconstrue *Story* as holding that good faith and fair dealing claims are necessarily tort-based if they arise under a statute. Our holding in *Story* only established that tort-based bad faith claims may only be brought in the context of a "special relationship." Otherwise, good faith and fair dealing claims are essentially all breach of contract claims. Dolls have not alleged they were in a special relationship with LBWR, but it is at best unclear that the relationship meets the criteria to make it a "special" one under *Story*. 242 Mont. at 451, 791 P.2d at 776. *Story* is eminently helpful for its analysis of the tension between tort and contract in cases like this, but it does not support Dolls'

25

assertion that LBWR's good faith and fair dealing claim arises under an "entirely separate" source than the Operating Agreement because it is also provided for by § 35-8-310(4), MCA.

¶73    In *Phelps v. Frampton*, we explained that a good faith and fair dealing claim under the Montana Uniform Partnership Act (MUPA), Title 35, chapter 10, MCA, was *not* separate from the implied covenant of fair dealing in a partnership agreement.[11]  There, in a dispute between attorneys over their partnership agreement, we determined that the obligation of good faith and fair dealing "is neither a fiduciary duty arising out of the partners' special relationship nor a separate and independent obligation; rather, it is 'an ancillary obligation' that is dependent on the existence of another duty or a right arising under the partnership agreement."  2007 MT 263, ¶ 30, 339 Mont. 330, 170 P.3d 474.  In other words, the fiduciary duties arising under statute and a partnership or operating agreement coexist and are not "entirely separate," like a bad faith claim that arises from a "special relationship."  *Story*, 242 Mont. at 451, 791 P.2d at 776.

¶74    Applying the same principle to fiduciary duties under the MLLCA, it is logical that statutory provisions codifying fiduciary duties for an LLC "function like a contract." "When one party uses discretion conferred by the contract to act dishonestly or to . . . deprive the other party of the benefit of the contract," the cause of action is, in essence, a breach of contract.  *Story*, 242 Mont. at 450, 791 P.2d at 775.  Here, Dolls leveraged their ability to withhold a contribution to the Finch/Dement purchase against

---

[11] Dolls note that MUPA is "the source of an identical legal obligation" as the obligation of good faith and fair dealing under the MLLCA.

LBWR in order to force their consent to the Settlement Agreement. Dolls would not have been afforded discretion to do so but for their membership in LBWR, and LBWR was deprived of a material benefit of the Operating Agreement as a result. Like "the great majority" of good faith and fair dealing claims, LBWR's breach of fiduciary duty and obligation of good faith and fair dealing claims would never have formed but for the existence of the Operating Agreement and Dolls' membership in LBWR.

¶75    The majority of the cases that Dolls rely upon are distinguishable because they involved professional services contracts and thus implicated professional standards of care. In *N. Mont. Hosp.*, for example, we provided, in relevant part:

> In a case that concerns the breach of *a professional service contract . . .* if the claims are based upon breach of specific provisions in the contract, the action sounds in contract and the contract statute of limitations applies. If, however, the claims are based on a breach of a legal duty imposed by law that arises out of the performance of the contract, the action sounds in tort and the tort statute of limitations applies.

248 Mont. at 315, 811 P.2d at 1278-79. There, a hospital sued an architect under several breach of contract and negligence theories alleging the architect was at fault for issues with the structure's heating, ventilation, and air-conditioning systems. *N. Mont. Hosp.*, 248 Mont. at 313, 811 P.2d at 1277-78. Ultimately, only the negligent design and negligent breach of contract claims were submitted to the jury. *N. Mont. Hosp.*, 248 Mont. at 314, 811 P.2d at 1278. Our relevant holding in the appeal involved the plaintiff's argument that its negligence claims survived the three-year statute of limitation for torts based on the continuing relationship doctrine and the accrual date for negligence actions. *N. Mont. Hosp.*, 248 Mont. at 315-16, 811 P.2d at 1279-80. Although we affirmed and impliedly

27

agreed that architectural malpractice sounds in tort, that question was not the focus of our inquiry, thus we did not carefully scrutinize it. Nevertheless, our ruling there comports with other cases establishing that tort liability for breach of a general standard of care may exist regardless of a contract. *See, e.g., Billings Clinic v. Peat Marwick Main & Co.*, 244 Mont. 324, 797 P.2d 899 (1990).

¶76    In *Billings Clinic*, we ruled that an accountant owes a general duty of care even when their contract limits the scope of representation. 244 Mont. at 339, 797 P.2d at 909. Likewise, in *Tin Cup Water v. Garden City Plumbing & Heating, Inc.,* we affirmed that an engineer's alleged duty to supervise and accept a contractor's work was not contract-based because the contract did not address that issue, and if there was a duty of care, it was a professional duty that sounded in tort. 2008 MT 434, ¶¶ 27, 36, 347 Mont. 468, 200 P.3d 60. An architect, accountant, and engineer may thus owe professional duties of care regardless of the existence of or terms of a contract. Neither Dolls nor LBWR, however, allege a breach of duty that could exist without the Operating Agreement.

*Punitive Damages*

¶77    Having determined that the statute of limitation for contract-based claims applies to LBWR's counterclaims, we turn to the issue of punitive damages. Section 27-1-220(2)(ii), MCA, provides that punitive damages may not be recovered in any action arising from breach of contract. LBWR's counterclaims were, in essence, breach of contract claims, thus it was improper for the District Court to award such damages. The District Court must revise its order to reflect that fact.

¶78 During trial, the District Court explained to Dolls' counsel that it would send the issue of punitive damages to the jury because our decision in *Romo* allows for punitive damages when tort and contract liability arise alongside each other.

¶79 In *Romo*, a group of farmers sued a business that it had contracted with to grow hemp after the business failed to pay the farmers for the product. *Romo*, ¶¶ 2-7. The business repeatedly made false statements to the farmers that they would soon receive payment, but it never made payment and the product rotted in the fields. *Romo*, ¶ 6. In addition to suing the business for breach of contract, the farmers alleged the business was liable in tort for their repeated false statements and misrepresentations to the farmers, and their negligence ultimately caused the loss of all of the hemp. *Romo*, ¶ 11. The farmers were awarded compensatory and punitive damages, which we affirmed because Farmers' tort claims "stemmed from Defendants' duties to Farmers existing outside of the contracts." *Romo*, ¶ 19.

¶80 Here, the District Court failed to analyze exactly *how* tort liability and contract liability arose side-by-side in this case, instead conflating them as having arisen together. In its April 23, 2021 ruling on summary judgment, the District Court determined "Here breach of fiduciary duty is a tort the liability for which is created by Mont. Code Ann. § 35-8-310[,]" and then immediately concluded "Also, the Dolls' fiduciary duty and any liability incurred from its breach arise from the Operating Agreement which is undoubtably an 'instrument in writing' and an enforceable contract. Thus, a claim for

breach of fiduciary duty is 'an action upon . . . contract . . . .'[12]   As we have discussed, Dolls' liability could not have similarly existed outside the contract here, thus punitive damages were improper under *Romo* and § 27-1-220(2)(ii), MCA. *Romo*, ¶ 19.

**CONCLUSION**

¶81   The District correctly concluded that Dolls were dissociated on February 2, 2018. The calculation for Dolls' distribution was also correct.  Furthermore, LBWR is not entitled to attorney fees and costs because the Operating Agreement did not provide for them prior to Dolls' dissociation.  Finally, the District Court correctly concluded that the eight-year statute of limitation applied to LBWR's contract-based counterclaims, but it erred in awarding punitive damages.  Affirmed in part and remanded with instructions to remove LBWR's award of punitive damages.


/S/ MIKE McGRATH


We Concur:

/S/ INGRID GUSTAFSON
/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE


---

[12] Presumably, Dolls did not dispute this contradiction on appeal because the outcome would have been more favorable if we had determined LBWR's counterclaims sounded in tort.

30