FILED

09/09/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 24-0128

DA 24-0128

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 199

MICHAEL A. HEBERT,

      Plaintiff and Appellant,

  v.

SHIELD ARMS, LLC, BRANDON ZEIDER,
SETH BERGLEE, ERIC SQUIRES,
RAYMOND DEAN BRANDLY, and
SHIELD DEVELOPMENT GROUP, LLC.,

      Defendants and Appellees.

APPEAL FROM:   District Court of the Eleventh Judicial District,
                In and For the County of Flathead, Cause No. DV-19-132(A)
                Honorable Amy Eddy, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Charles H. Carpenter, Carpenter Law Firm, PLC, Missoula, Montana

      For Appellees:

      Doug Scotti, Frampton Purdy Law Firm, Whitefish, Montana

              Submitted on Briefs:  June 25, 2025

                      Decided:  September 9, 2025

Filed:

                                _____
                                      Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 Michael A. Hebert ("Hebert") appeals from two orders of the Eleventh Judicial District Court, Flathead County: (1) the October 23, 2023 Order Re: Various Motions which, relevant here, granted in part and denied in part Hebert's Motion to Compel Production of Documents and Extend Time for expert disclosures, and (2) the February 7, 2024 Order Re: Cross Motions for Summary Judgment, which denied Hebert's motion for partial summary judgment and granted the above-named Defendants' (collectively, "Defendants") Motion for Summary Judgment. In granting the Defendants' Motion for Summary Judgement on all counts, the District Court held (1) Hebert was properly dissociated from Shield Arms, LLC ("SA") because continuing to carry on business with him as a member would be unlawful; (2) Shield Development Group, LLC ("SDG") had a valid operating agreement at the time of dissociation and Hebert was properly dissociated pursuant to the terms of that agreement; (3) Hebert's interests in both LLCs were properly valued at the time of his dissociation; (4) Hebert had demonstrated no genuine issues of material fact existed with regard to his defamation claim and the Defendants were thus entitled to judgment as a matter of law;[1] and (5) Hebert had provided no evidence the Defendants had exercised unlawful possession or control over his property, thus entitling the Defendants to judgment as a matter of law on Hebert's conversion claim. We affirm in part, and reverse in part.

¶2 We restate the issues on appeal as follows:

---

[1] This claim has not been raised on appeal.

*1. Whether Defendants were entitled to summary judgment because Hebert was dissociated from SA by unanimous vote of its members and it was unlawful to carry on SA's business with Hebert as a member.*

*2. Whether Defendants were entitled to summary judgment because Hebert was dissociated from SDG under the operating agreement.*

*3. Whether the District Court erred in valuing Hebert's distributional interest in SDG pursuant to § 35-8-809, MCA, and SDG's operating agreement.*

*4. Whether the District Court erred in valuing Hebert's distributional interest in SA and its application of § 35-8-809, MCA, when it failed to consider SA's going concern value.*

*5. Whether the District Court abused its discretion by denying Hebert's request for extension of the deadline for providing expert reports and denying in part his motion to compel evidence relevant for discovery.*

*6. Whether the District Court erred by granting summary judgment to Defendants on Hebert's conversion claim.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 Our facts are taken from the motions for summary judgment. Additional facts will be noted in the Discussion section below as necessary.

¶4 Hebert, Brandon Zeider ("Zeider"), and Seth Berglee ("Berglee") founded SA in April 2017 and served as its three equal managing partners. SA, pursuant to a Federal Firearms License ("FFL"), designs, manufactures, and sells firearms products and accessories. SA never adopted a formal operating agreement. In 2018, the three SA members also formed SDG with Eric Squires ("Squires") and Raymond Dean Brandly ("Brandly"). SDG adopted an Operating Agreement in January 2019; the members unanimously voted to value the net worth of SDG at $500; and they reaffirmed this valuation with another unanimous vote at a March 21, 2019 meeting of the members. Hebert disputes

3

that he signed the Operating Agreement. Instead, he believed he had signed a blank signature page in January 2019 authorizing Squires to sell or license SDG's intellectual property at a trade show and, upon learning that his signature had been appended to the Operating Agreement, called SDG's attorney, who then scheduled the March 21, 2019 meeting to discuss the discrepancy. Hebert claims the recording of that meeting was altered to omit his discussion of perceived flaws in the Operating Agreement and the inclusion of his signature.

¶5 Between January and March of 2019, SA's only employee, Alicia Hauss ("Hauss"), witnessed Hebert taking company inventory from the facility without notice, expressing ideas and statements inconsistent with SA's standard protocol, and shifting abruptly between anger, laughter, and sadness. In the middle of March 2019, Zeider met with Hebert, who was agitated and making accusations of fraud and theft. Zeider thought Hebert seemed detached from reality. Hebert was again volatile and behaved irrationally at meetings with Zeider and Berglee on March 21 and 23, 2019. The two other SDG members, Squires and Brandly, also became concerned for Hebert's well-being and mental fitness.

¶6 Hebert's irrational behavior included repeatedly asking several of SA's members to cease all business affairs with 17 Design and Manufacturing, LLC ("17 D & M"). Brandly owned 17 D & M, which had become SA's most important vendor and source of the company's top grossing revenue since the two companies began conducting business together in 2018. The personal relationship between Hebert and Brandly had deteriorated, however, with Hebert leveling a series of escalating accusations against SA's vendor that

jeopardized the business relationship. Hebert's accusations included allegations Brandly had lied about his military service and stolen intellectual property from other companies, including his previous employer. Hebert engaged in a mostly one-sided exchange with Zeider and Berglee, inundating them with messages regarding Brandly and threatening to "use a nuclear option against everyone" if SA continued to do business with Brandly. Hebert also shared his allegations with a longtime friend, characterizing Brandly as "a professional conman who infiltrated businesses, stole their intellectual property, and took their money through unscrupulous business dealings." Hebert was unable to produce any evidence in support of these allegations against Brandly during the course of litigation.

¶7     On April 11, 2019, Hauss sent a complaint to Zeider regarding Hebert's behavior, stating that he frightened her and she was uncomfortable in his presence. Hauss refused to come to the SA facility if Hebert was there. In her affidavit, Hauss recalled a March 21, 2019 incident in which Hebert stormed into the SA facility and yelled accusations at Zeider. He continued his outburst on a conference call. Hauss characterized Hebert's behavior as unstable and unpredictable.

¶8     Zeider later attested to further disconcerting behavior of Hebert. On March 12, 2019, Hebert had issued "a wild barrage of accusations . . . ranging from fraud to theft." Hebert's statements and behaviors, according to Zeider, "were detached from reality." On one occasion, Hebert took away several members' phones and warned "in hushed tones" about a mutual friend's assassination "by the government because of what he knew about the Mandalay Bay shooting in Las Vegas," "radioactive materials that take a month to kill," and

warning he and Zeider would be next "if 'they' found out what 'we know.'" That mutual friend had actually died due to complications from cancer. Hebert further claimed to have recruited fellow members of his church to destroy a local abortion and reproductive health clinic. Zeider claimed "[Hebert's] behavior and personality changed abruptly [. . .,] he acted like a different person." During a March 21, 2019 meeting, Hebert accused Berglee and Zeider of "lying, stealing, and deliberately altering the SDG Operating Agreement to [Hebert's] detriment."

¶9     According to Zeider, Hebert's conduct at a March 2019 memorial service for the owner of New Frontier Armory, one of SA's major suppliers, "irreparably damaged" the ongoing business relationship between the two companies. Zeider claims that, at a March 23, 2019 conference call between the members to discuss the deterioration of SA's relationship with New Frontier Armory, Hebert accused Zeider of "sneaking around" company business, orchestrating "secret meetings" without Hebert's attendance, and swapping out paperwork on a patent. Hebert allegedly stated the patent attorney "had orchestrated a conspiracy to exclude him," thus "screwing him over." Hebert denied any responsibility for the breakdown between SA and New Frontier Armory, instead blaming the decline in breakdown on Brandly's refusal to engage New Frontier Armory any further and Brandly's hiring of a "key New Frontier employee" away from New Frontier Armory.

¶10     In April 2019, Hebert began contacting SA's business partners to inform them of Brandly's alleged wrongdoings. He contacted Zev Technologies, threatening to sue if they continued to use "IP" stolen from Shield Arms by Brandly. Consequently, Zev

6

Technologies cancelled $2,000,000 worth of purchase orders with SA. Hebert also contacted Aero Precision, a firearms manufacturer that had a verbal multi-million-dollar licensing agreement with SA, and Agency Arms, another company with a business relationship with SA, to share his allegations against Brandly.

¶11 Hebert leveled further accusations against Zeider and Berglee, including in an April 5, 2019 text message wherein he claimed SA members were "working in conspiracy to ruin me, my position, reputation, honor, future wealth and creations, IP and service to my nation." He demanded they "ask for forgiveness (I will forgive) and move to defend me, my IP, honor, fortune, etc." Should Berglee and Zeider not comply, Hebert threatened to sue them.

¶12 17 D & M sent a cease-and-desist letter, dated April 11, 2019, to SA, demanding Hebert "immediately cease and desist [his] slanderous communications" and further threatening to file claims of damages against SA for Hebert's conduct and put an end to the business relationship between SA and 17 D & M altogether.

¶13 Zeider and Berglee unanimously voted to dissociate Hebert from SA on April 17, 2019, on the basis that carrying on the business of SA with him as a member had become unlawful. SA lacked an operating agreement, but Zeider believed that because the business is a firearms manufacturer with an FFL, SA could not tolerate Hebert's conduct. Further, Hebert's behavior, words, actions, and ongoing damage to the business were unlawful. Simultaneously, the members of SDG voted unanimously to dissociate Hebert from the company. The Operating Agreement of SDG provides that "[a] member may be dissociated

from the company by unanimous decision of all other members." Hebert's 20% interest in SDG was valued at $100.

¶14 Hebert initially filed his lawsuit raising 24 causes of action against the Defendants on December 13, 2019, but did not pursue litigation in earnest until November 4, 2022, when he filed a First Amended Complaint alleging six causes of action. His claims against the Defendants included wrongful dissociation from SA and SDG; wrongful valuation of distributional interests; defamation; and conversion. Hebert moved for partial summary judgment and the Defendants moved for summary judgment on all counts. Hebert additionally moved to compel production of documents and sought an extension of time to file expert disclosures. The District Court issued its October 23, 2023 Order Re: Various Motions granting Hebert's motion to compel in part. The court required SA produce financial records up until the date of his dissociation but denied his request for an extension of time for expert disclosures in which his retained expert could analyze these supplemental disclosures. With Hebert's motion to revise the October 23 Order pending, the District Court issued its February 7, 2024 Order granting Summary Judgment to the Defendants.

¶15 Hebert now appeals.

## STANDARD OF REVIEW

¶16 We review a district court's grant of summary judgment de novo, using the same standards applied by the district court. *Wurl v. Polson Sch. Dist. No. 23*, 2006 MT 8, ¶ 10, 330 Mont. 282, 127 P.3d 436 (citation omitted). "The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that

there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." M. R. Civ. P. 56(c)(3). Once the moving party has demonstrated that no genuine issues of material fact exist, the burden shifts to the non-moving party to prove by more than mere denial and speculation that a genuine issue of material fact does exist. *Williams v. Plum Creek Timber Co.*, 2011 MT 271, ¶ 14, 362 Mont. 368, 264 P.3d 1090 (citations omitted). A material fact is a fact that involves the elements of the cause of action or defenses at issue to an extent that necessitates resolution of the issues by a trier of fact. *Williams*, ¶ 14 (quotation omitted). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party and all reasonable inferences must be drawn in favor of the party opposing summary judgment. *Williams*, ¶ 15 (citation omitted). We review the court's legal conclusion to grant or deny summary judgment to determine whether the court erred. *Williams*, ¶ 14 (citation omitted).

¶17 A court's interpretation of a statute is a question of law that we review for correctness. *City of Missoula v. Fox*, 2019 MT 250, ¶ 8, 397 Mont. 388, 450 P.3d 898 (citation omitted).

¶18 We review a district court's order denying a motion to compel discovery for an abuse of discretion. *Egan Slough Cmty. v. Flathead Cnty. Bd. of Comm'rs*, 2022 MT 57, ¶ 15, 408 Mont. 81, 506 P.3d 996 (citing *Lynes v. Helm*, 2007 MT 226, ¶ 17, 339 Mont. 120, 168 P.3d 651). A court's decision regarding late disclosure of an expert witness is an evidentiary ruling that we review for an abuse of discretion. *B Bar J Ranch, LLC v. Carlisle Wide Plank Floors, Inc.*, 2012 MT 246, ¶ 13, 366 Mont. 506, 288 P.3d 228 (citing *Mason v. Ditzel*, 255

Mont. 364, 370-71, 842 P.2d 707, 712 (1992)). An abuse of discretion occurs if the court exercised discretion based on a clearly erroneous finding of fact, erroneous conclusion or application of law, or otherwise acted arbitrarily, without conscientious judgment or in excess of the bounds of reason, resulting in substantial injustice. *Mein v. Hren Ranches, Inc.*, 2020 MT 284, ¶ 13, 402 Mont. 92, 475 P.3d 748.

## DISCUSSION

¶19 1. *Whether Defendants were entitled to summary judgment because Hebert was dissociated from SA by unanimous vote of its members and it was unlawful to carry on SA's business with Hebert as a member.*

¶20 Montana adopted the Limited Liability Company Act (MLLCA) in 1993 and has since amended it to substantially follow the Uniform Limited Liability Company Act (1996). *White v. Longley*, 2010 MT 254, ¶ 34, 358 Mont. 268, 244 P.3d 753 (citing § 35-8-101, *Annotations*, Official Comments). All members of a limited liability company may enter into an operating agreement to regulate the affairs of the company and the conduct of its business and to govern relations among the members, managers, and company. Section 35-8-109(1), MCA. To the extent that an operating agreement does not otherwise provide, or in the absence of an operating agreement altogether, the MLLCA governs relations among the members, managers, and company. Section 35-8-109(1), MCA.

¶21 SA never adopted an operating agreement. Thus, the provisions of the MLLCA control the procedure for dissociating a member. Section 35-8-109(1), MCA. Relevant here, the MLLCA provides that a member is dissociated upon the occurrence of a unanimous vote expelling the member if "it is unlawful to carry on the company's business

10

with the member." Section 35-8-803(1)(e)(i), MCA. The Defendants maintain, and the District Court held, that it became unlawful to continue to carry on the business of SA with Hebert as a member because of his behavior, words, actions, and the ongoing damage he caused to the business.

¶22 "Unlawful" is not defined by the MLLCA. The District Court drew from the language of § 28-2-701, MCA, which addresses what is unlawful in a contract. However, applying an even narrower definition than § 28-2-701, MCA, unlawful must mean at least those actions which are contrary to express provisions of law. If the law forbids certain conduct or requires conduct to conform to a certain standard, then it is unlawful to either participate in the forbidden conduct or fail to conduct oneself in accordance with the required standard. Here, there are express provisions of law that would be violated if the other members were to carry on with Hebert as a member: they would violate their own fiduciary duties of care and loyalty required of them by § 35-8-310, MCA. Specifically, the duty of care requires a member "to refrain[] from engaging in grossly negligent or reckless conduct." Section 35-8-310(3), MCA. Given Hebert's actions, it would be at least reckless, if not grossly negligent, to allow him to continue as a member. To permit Hebert to continue governing the company would result in all of the other members expressly violating their fiduciary duties in contravention of express legal provisions.

¶23 In addition to finding a violation of general standards for a member's conduct set forth in § 35-8-310, MCA, the District Court found that Hebert's baseless claims against Brandly and interference with SA's business relationships constituted slander and tortious

11

interference, in violation of express provisions of the law. The court observed that Hebert's actions could be imputed to SA pursuant to § 35-8-306, MCA (A company is "liable for loss or injury caused to a person, or for a penalty incurred, as a result of a wrongful act or omission or other actionable conduct of a member or manager acting in the ordinary course of business of the company or with the authority of the company."). Finally, SA's only employee, Hauss, observed Hebert taking company inventory from the facility without notice, verbally communicating ideas outside company protocol, and having strong emotional outbursts that vacillated from yelling to laughing to sadness within hours. Other members observed that Hebert's behavior appeared detached from reality. Thus, the District Court concluded Hebert's conduct not only interfered with SA's business and was tortious, but the court also concluded Hebert created a hostile work environment for SA's employee—exposing it to liability.

¶24 Hebert offers that § 35-8-803(f), MCA, is the only applicable dissociation provision. Section 35-8-803(f), MCA, allows for dissociation to be determined by a court upon request of the company or another member. However, Hebert's interpretation assumes that subsection (e) and subsection (f) are mutually exclusive; the behaviors enumerated under (f) cannot constitute unlawful behaviors under (e), and therefore (e)'s definition of unlawful must be a high bar reserved for only those unlawful behaviors not enumerated under (f) that make it literally impossible to continue doing business in a lawful manner. By this interpretation, an ongoing breach of fiduciary duty—contrary to an express provision of law and thus unlawful under any reasonable definition of the term—is not unlawful under (e)

12

because it is one of those instances addressed by (f). Such an interpretation ignores a paramount difference between subsections (e) and (f): (e) has a threshold requirement of a unanimous vote of the members, whereas (f) requires application to a court by only one member.

¶25 Although Hebert attempts to distinguish the two subsections by focusing on the type of conduct that would warrant dissociation, Hebert fails to address the most obvious features of the subsections: under subsection (e) the high burden is to have a unanimous vote of all members; under (f) a judge decides based on one member's application to the court. If all the other members agree that it is unlawful to carry on with the problem member, there is an absolute urgency in removing the problem member so that the other members and the company can bring themselves into compliance with the law. And there is no real threat that this action will be taken lightly, as a wrongful dissociation claim is likely to result if the behavior is not truly unlawful. On the other hand, if there is not unanimous agreement regarding the necessity of dissociating a problem member, the law provides an alternative method whereby a judge determines whether expulsion is an appropriate remedy.

¶26 Here, the members unanimously agreed that carrying on the company's business with Hebert as a member would be impossible to do lawfully. There can be no reasonable question that allowing Hebert to remain in a governing role would cause a violation of their fiduciary duties in contravention of express provisions of law—exactly the kind of emergency situation for which § 35-8-803(e)(i), MCA, provides immediate relief upon a unanimous vote. The members had an interest in removing Hebert from a governing

position as quickly as possible—quicker than even a judicial application could afford. On April 11, 2019, SA received a letter from legal counsel for one of its clients demanding that Hebert "immediately cease and desist [his] slanderous communications," and threatened to file claims of damages against SA for Hebert's conduct. The unanimous vote to dissociate from Hebert came two days later.

¶27 The District Court did not err in finding that the qualification of unlawfulness was satisfied under § 35-8-803(e)(i), MCA. The subsection provides a vehicle to address the unlawful action of a problem member which created an emergency for the company, without going through the lengthy process of applying to a court for an order of dissociation. The evidence was clear that Hebert's tortious and unlawful actions threatened SA's survival and the members had to act immediately to prevent further harm to their company. The plain meaning of the statute allows for a unanimous vote of its members to address the tortious, i.e., unlawful conduct, of one of its members.

¶28 *2. Whether Defendants were entitled to summary judgment because Hebert was dissociated from SDG under the operating agreement.*

¶29 The MLLCA allows the members of an LLC to adopt an operating agreement "to regulate the affairs of the company and the conduct of its business and to govern relations among members, managers, and company." Section 35-8-109(1), MCA. Still, an operating agreement may not eliminate a member's duty of loyalty, unreasonably reduce the duty of care, or eliminate the obligation of good faith and fair dealing provided for in § 35-8-310, MCA. Section 35-8-109(3)(b)-(d), MCA. Moreover, the MLLCA provides that an

14

operating agreement cannot abrogate the right to expel a member upon the occurrence of an event specified in § 35-8-803, MCA. Section 35-8-109(3)(e), MCA.

¶30 Here, Hebert contends he did not knowingly sign the SDG operating agreement and instead signed a blank page for the specific purpose of approving a transaction involving intellectual property owned by SDG. While Hebert argues the minutes from the March 21, 2019 membership meeting indicated another operating agreement would be created, no evidence in the record indicates the other members of SDG shared the belief that SDG's operating agreement had been revoked at any time prior to the vote to dissociate Hebert. The District Court found Hebert's claims, even after completing discovery, failed to create a genuine issue of material fact. The Defendants produced the Operating Agreement, complete with clearly labeled footers on each page designating the document "Restated Operating Agreement." Despite Hebert's allegations that he signed a blank page for different purposes, the signature page, appended to the entire document, contained a footer identifying it as belonging to the Operating Agreement. The signature page included signature lines for all five SDG's members—including Hebert. Hebert's claim that the Operating Agreement was revoked prior to his dissociation is speculative and unsupported by any evidence in the record. Thus, the SDG Operating Agreement was effective at the time of Hebert's dissociation.

¶31 We turn next to whether the Defendants were entitled to judgment as a matter of law. The MLLCA allows for the dissociation of a member when the member's expulsion is pursuant to the LLC's operating agreement. Section 35-8-803(1)(d), MCA. Article 11.2 of

15

the SDG Operating Agreement, effective at the time of Hebert's dissociation, provides for Dissociation by Vote, pursuant to which "[a] member may be dissociated from [SDG] by unanimous decision of all other members." Here, none of the parties dispute that SDG's members, excluding Hebert, unanimously voted on April 19, 2019, to dissociate Hebert. The Defendants therefore complied with Article 11.2. The District Court did not err in granting the Defendants' motion for summary judgment because Hebert was properly dissociated pursuant to the SDG Operating Agreement.

¶32    3. *Whether the District Court erred in valuing Hebert's distributional interest in SDG pursuant to § 35-8-809, MCA, and SDG's operating agreement.*

¶33    Having determined Hebert was properly dissociated from SDG, we turn next to a review of whether the District Court erred in its valuation of his ownership interest in the company.

¶34    The MLLCA default valuation of a dissociated member's ownership interests is determined by fair value and a court is free to determine this fair value based on fair market, liquidation, or any other method deemed appropriate under the circumstances. Section 35-8-809, MCA, *Annotations*, Official Comments. This default position does not apply when "the price and terms of a purchase of a distributional interest are fixed or are determined by the operating agreement[.]" Section 35-8-808(3), MCA.

¶35    Here, the SDG Operating Agreement controls the value of Hebert's distributional interest. Article 7.4 of the Operating Agreement, approved by a vote in January 2019 and reaffirmed by a vote on March 21, 2019, valued each member's interest at $100, setting SDG's total net worth at $500. After dissociating with Hebert, SDG sent him a letter

explaining the valuation of his distributional interest was $100 under the terms of SDG's

Operating Agreement. Having determined pursuant to § 35-8-808(3), MCA, that SDG had

an Operating Agreement at the time of Hebert's disassociation which clearly established the

company's net worth and specified a distributional interest amount, we affirm the District

Court's valuation of Hebert's 20% ownership interest in SDG as $100.

¶36    *4. Whether the District Court erred in valuing Hebert's distributional interest in SA and its application of § 35-8-809, MCA, when it failed to consider SA's going concern value.*

¶37    In a court action to determine the fair value of a member's distributional interest, the

court shall:

> determine the fair value of the interest, considering among other relevant evidence the going concern value of the company, any agreement among some or all of the members fixing the price or specifying a formula for determining value of distributional interests for any other purpose, the recommendations of any appraiser appointed by the court, and any legal constraints on the company's ability to purchase the interest[.]

Section 35-8-809(1)(a), MCA. Because SA, in contrast to SDG, did not have any agreement

for determining a member's distribution value, we must examine whether the court, in

determining the fair value of the interest, correctly applied the considerations set forth in

§ 35-8-809(1)(a), MCA.

¶38    Here, the District Court determined Hebert's distributional interest based on the Rule

56 record compiled by SA as part of the company's motion for summary judgment. Hebert

provided no competing financial analysis of SA's valuation and the court, finding no

genuine dispute of material facts, then granted summary judgment to SA based upon that

valuation alone. However, our review of the record indicates that the valuation proffered

17

by SA in SA's buy out letter to Hebert, and again presented to the court as part of the Rule 56 summary judgment record, is comprised only of an accounting of SA's assets and liabilities as of the date of Hebert's dissociation. SA did not provide—and the District Court ultimately did not consider—the "going concern" value of SA. "Going concern" refers to "a commercial enterprise actively engaging in business with the expectation of indefinite continuance." *Going Concern*, *Black's Law Dictionary* (12th ed. 2024). Thus, § 35-5-809, MCA, requires the district court consider the value of the indefinite continuance of SA as a commercial enterprise, as SA did not dissolve upon Hebert's dissociation and has continued operations; the value of SA as a business—i.e., its value as a brand or the value of its customer base. Absent such evidence of the company's "going concern," and lack of rebuttal facts presented by Hebert notwithstanding, the District Court could not determine an accurate "fair value" as required by the MLLCA.

¶39 Because the District Court erred in its valuation of SA and the amount of Hebert's distributional interest because it failed to consider the "going concern" value of SA, we reverse that portion of the District Court's grant of summary judgment pertaining to SA's value and remand for further proceedings consistent with this Opinion.

¶40 *5. Whether the District Court abused its discretion by denying Hebert's request for extension of the deadline for providing expert reports and denying in part his motion to compel evidence relevant for discovery*

¶41 Hebert additionally argues the District Court abused its discretion in denying his request for an extension of the deadline for providing expert reports and by only compelling

18

the production of SA financial records up until the date of his dissociation from the company.

¶42     The District Court may have properly exercised its discretion given the state of the litigation at that time when it denied Hebert's motion to compel and his request for an extension of time for expert disclosures, but we have now determined Hebert's distributional interest in SA was incorrectly determined by the District Court. The District Court will, once again, have to determine the relevance of any particular financial records to a complete valuation, including SA's "going concern," on remand. While the District Court correctly determined that Hebert's distributional interest must be determined at the time of dissociation, there may be post-dissociation financial records which are relevant to valuing SA's "going concern" at the point of Hebert's dissociation. Accordingly, the District Court may exercise its discretion in determining the relevance, if any, of post-dissociation financial records on remand. Likewise, to the extent that the production of information relevant to the valuation of SA has reset the court's scheduling on remand, the court should determine a new expert disclosure deadline to accommodate analysis of this supplemental information to assist in determining the fair value of Hebert's distributional interest.

¶43     *6. Whether the District Court erred by granting summary judgment to the Defendants on Hebert's conversion claim.*

¶44     On appeal, Hebert maintains the Defendants exercised unlawful possession or control over both his personal property left on the SA premises as well as his intellectual property after his dissociation from the company. The Defendants assert any personal

19

property left on the premises was transferred to an off-site storage unit accessible to Hebert. Additionally, the Defendants claim Hebert has not proven the inventions he alleges an ownership interest in exist or that the Defendants have manufactured or sold any of these supposed inventions. The District Court agreed with the Defendants, concluding Hebert "has not provided any evidence that SDG or [SA] have intentionally exercised possession or control over Hebert's property inconsistent with his ownership rights and without right or consent." The court concluded SA had returned Hebert's personal property, noting Hebert did "not state or specify what other personal property of his was never returned to him[,]" and that Hebert had "assigned his interest in [a firearm component] patent to SDG."

¶45 "A plaintiff alleging a claim of conversion must establish the following four elements: (1) property ownership by the plaintiff; (2) plaintiff's right of possession of the property; (3) defendant's unauthorized control over the property; and (4) damages." *Feller v. First Interstate Bancsystem, Inc.*, 2013 MT 90, ¶ 26, 369 Mont. 444, 299 P.3d 338 (citation omitted).

¶46 Hebert alleges the property relocated to the storage unit did not include all of his belongings. He claims Zeider provided him with a list of his personal firearms still in SA's possession. In support of this claim, Hebert produced a list of allegedly missing firearms and receipts showing he purchased them. Zeider categorically denied providing "some list of Hebert's allegedly unreturned firearms" and further claimed the list had "been fabricated by Hebert."

20

¶47    The Defendants provided a detailed list of the items returned to Hebert, including photographs of the stored property and records of when Hebert retrieved his property. Hebert's proffered list and receipts fail to demonstrate that firearms he claims were missing were stored on site at SA or in SA's continued possession. While his list and receipts might prove he at some point in time owned the firearms, Hebert failed to provide any evidence demonstrating the Defendants exercised unauthorized control over his personal property, a required element of any conversion claim. Accordingly, the District Court was correct in determining Hebert failed to establish a genuine dispute of material fact regarding the conversion of his personal property by the defendants.

¶48    We turn next to the alleged conversion of Hebert's intellectual property. Hebert alleges SA was unlawfully using patents invented by Hebert. Purportedly, Hebert had conducted extensive correspondence with SDG's patent attorney detailing "how he came to invent each item," but the Defendants had deleted the emails. A single drawing of one such invention was all that Hebert produced of his work. However, at the time of dissociation, SDG only had an interest in the intellectual property for one firearm component, a "Folding Lower Receiver" ("FLR"). Each member of SDG, including Hebert, had jointly filed the patent application for the FLR before transferring their interest in the patent to SDG. Other pending patent applications likewise included all SDG members' signatures and language transferring the patent to SDG. Nothing in the record suggests any intellectual property solely created by Hebert was being unlawfully manufactured, sold, or marketed by the

21

Defendants. As with his personal property conversion argument, Hebert has failed to offer evidence demonstrating the unauthorized control of his property by the Defendants.

¶49 The record indicates the Defendants did not exercise unauthorized control over Hebert's personal property and that he had assigned his interest in the FLR patent to SDG. Hebert has demonstrated no genuine dispute of material facts, and we conclude that the District Court correctly granted summary judgment to the Defendants on Hebert's conversion claim.

## CONCLUSION

¶50 The District Court correctly determined SA had properly dissociated Hebert on April 17, 2019, by a unanimous vote of the members after Hebert's conduct made continued business operations with him unlawful. The District Court correctly determined SDG had dissociated Hebert on April 17, 2019, pursuant to SDG's Operating Agreement. The District Court correctly determined the value of Hebert's distributional interest in SDG pursuant to values set by the Operating Agreement. The District Court erred in its valuation of Hebert's distributional interest in SA because the record did not reflect a consideration of the "going concern value" of the company. Accordingly, we remand for further proceedings pursuant to the requirements of § 35-8-809(1)(a), MCA, so that the court may consider, in addition to other factors, SA's going concern value. To the extent the post-dissociation financial records are relevant to determining the fair value of Hebert's distributional interest in SA, the court should consider these records on remand and allow Hebert the opportunity to present a valuation of his interest based upon the value of SA.

The District Court correctly granted summary judgment to the Defendants on Hebert's conversion claim.

¶51   The District Court is affirmed in part and reversed in part. We remand for further proceedings consistent with this Opinion.

/S/ LAURIE McKINNON

We Concur:

/S/ INGRID GUSTAFSON
/S/ BETH BAKER
/S/ KATHERINE M BIDEGARAY

Justice Jim Rice, concurring and dissenting.

¶52   The District Court and the parties have all acknowledged the difficulty in interpreting the statute governing this dispute, and the lack of case precedent providing guidance about summary dissociation of a limited liability company member upon vote of the membership. However, such a challenge is of no consequence to the Court, as it simply ignores the interpretative challenge, as well as the applicable statutory interpretive sources and tools, in favor of a freewheeling, ipse dixit reasoning based upon nothing. Such improvisation should be reserved for the theatre. On that lack of foundation, the Court leaps to the conclusion that "if there is not unanimous agreement regarding the necessity of dissociating a problem member, the law provides an alternative method whereby a judge determines whether expulsion is an appropriate remedy." Opinion, ¶ 25. By declaring that the statute provides these equally "alternative method[s]," the Court completely conflates the summary

23

dissociation provision and judicial dissociation provisions, holding that these remedies are mutually inclusive and available, without regard to the distinctive bases for dissociation provided by each provision, and thus undermines the Legislature's purpose in enacting two different provisions. I disagree, and based upon the guidance that is available—the text, statutory structure, Official Comments to the Uniform Act from which the Montana Act is drawn, and established legal definitions—I would conclude that the provisions, though not necessarily mutually exclusive, provide distinctive bases for dissociation, and that the record in this case does not establish a basis for summary nonjudicial dissociation of Shield Arms, LLC (SA), upon a membership vote. I would reverse the District Court's conclusion to the contrary, and thus, I dissent from Issue 1.

¶53 Beginning with the statute, "[t]he Montana Limited Liability Company Act (MLLCA [or the Act]), Title 35, chapter 8, was adopted in 1993 and was later amended to 'substantially follow the Uniform Limited Liability Act (1996).'" *Doll v. Little Big Warm Ranch, LLC*, 2024 MT 179, ¶ 36, 417 Mont. 493, 554 P.3d 175 (quoting *White v. Longley*, 2010 MT 254, ¶ 34, 358 Mont. 268, 244 P.3d 753). Because the source of our Act is the Uniform Limited Liability Act (ULLA), the Official Comments to the ULLA can provide helpful guidance to the interpretational question presented here, and are cited below.

¶54 In the absence of an applicable operating agreement provision, the MLLCA governs the relationships among members, managers, and the company. Section 35-8-109 (2023), MCA. Among these default statutory provisions, relevant here because SA had no operating agreement, the MLLCA provides procedures for dissociation of a member, which are

24

applicable depending upon the nature of the member's conduct, which are set forth

expressly. The Act states, in pertinent part:

(1) A member is dissociated from a limited liability company upon the occurrence of any of the following events:

.   .   .

(e) the member's expulsion by unanimous vote of the other members if:
(i) *it is unlawful to carry on the company's business with the member*;
(ii) there has been a transfer of substantially all of the member's distributional interest . . .;
(iii) within 90 days after the company notifies a corporate member that it will be expelled because it has filed a certificate of dissolution or equivalent, its charter has been revoked, or its right to conduct business has been suspended by the jurisdiction of its incorporation . . .; or
(iv) a partnership or a limited liability company that is a member has been dissolved . . .

.   .   .

(f) on application by the company or another member, the member's expulsion by judicial determination because the member:
(i) engaged in wrongful conduct that adversely and materially affected the company's business;
(ii) willfully or persistently committed a material breach of the operating agreement or of a duty owed to the company or the other members under 35-8-310; or
(iii) engaged in conduct relating to the company's business that makes it not reasonably practicable to carry on the business with the member[.]

Section 35-8-803(1)(e), (f), MCA (emphasis added). Thus, a member of a limited liability

company may be expelled "by unanimous vote of the other members"—the process utilized

in this case—if "it is unlawful to carry on the company's business with the member."

Section 35-8-803(1)(e)(i), MCA. The other default dissociation process provided by the

25

Act is described as a "member's expulsion by judicial determination," and authorizes dissociation upon application to a court when the member has "engaged in wrongful conduct that adversely and materially affected the company's business; willfully or persistently committed a material breach of the operating agreement or of a duty owed to the company or the other members under 35-8-310; or engaged in conduct relating to the company's business that makes it not reasonably practicable to carry on the business with the member." Section 35-8-803(1)(f), MCA.

¶55 The issue presented by the appeal is whether the District Court erred by concluding that Hebert could properly be summarily expelled as a member of SA upon the unanimous vote of the other two members. However, in addition to abandoning the tools of interpretation, the Court fails to explain the reasoning employed by the District Court that is challenged on appeal. *See* § 3-2-204(1), MCA ("[t]he supreme court may affirm, reverse, or modify any judgment or order appealed from"). The Court does not address whether the District Court's reasoning was right, wrong, or that it reached the right result for the wrong reason. *See Hubbell v. Gull SCUBA Ctr., LLC*, 2024 MT 247, ¶ 24, 418 Mont. 399, 558 P.3d 1094 ("We will not reverse the District Court when it reaches the right result, even if for the wrong reason.") (quotations omitted). I thus turn to the District Court's decision.

¶56 During oral argument, the District Court noted that the Defendants choose not to seek a judicial dissociation of Hebert as a member under § 35-8-803(1)(f), MCA, but elected instead to seek a nonjudicial dissociation of Hebert under § 35-8-803(1)(e), MCA, which is premised, in the case, upon the conclusion that "it is unlawful to carry on the company's business with the member." The District Court's summary judgment order noted that

26

Defendants were contending that "it became unlawful to continue to carry on the business of Shield Arms with Hebert as a member because of his behavior, words, actions, and ongoing damage to the business."

¶57    "Unlawful" is not defined within the Act and, as the parties recognize, there is a dearth of case law applying this provision from which to draw either precedential or persuasive authority.[1]   The District Court thus accepted the Defendants' invitation to look to the definition of "unlawful" set forth in § 28-2-701, MCA.   Title 28, Part 7 of the Code contains sections addressing illegal objects and provisions within contracts. Section 28-2-701, MCA, provides:

> **What is unlawful.**  That is not lawful which is:
> (1)    contrary to an express provision of law;
> (2)    contrary to the policy of express law, though not expressly prohibited; or
> (3)    otherwise contrary to good morals.

Applying this definition of "unlawful," the District Court first observed that the Defendants had provided no evidence that carrying on the business of Shield Arms with Hebert as a member constituted a violation of an express provision of law.   However, the District Court reasoned that "the undisputed facts demonstrate Hebert's ongoing conduct made it 'unlawful' for Shield Arms to carry on business with him as a member as it would have been contrary to the policy of express law and contrary to good morals."   In support of this

---

[1] Hebert does cite *Seymour v. New Design LLC*, No. ST-17-cv-347, 2018 V.I. LEXIS 134 (Super. Ct. U.S.V.I. 2018).   The Virgin Islands Court held that an LLC member's obtaining the protection of a domestic violence order against another member, who had also been charged criminally, did not "make it 'unlawful for all or substantially all of the business of the company to be continued'" under the *dissolution* provisions of the Act.

27

conclusion, the District Court reasoned: that Hebert had "contacted several of Shield Arms' business partners, threatening litigation if they used stolen 'IP' from [Brandly]," even though "Hebert has not provided evidence that [Brandly] stole anything from anyone"; that Hebert had made "baseless claims against [Brandly] and his interference with Shield Arms' business relationships" that were "tortious and are contrary to, prohibited, or unauthorized by law"; that "Hebert's conduct was in violation of his duty of care because he engaged in grossly negligent or reckless conduct and duty of good faith and fair dealing when he contacted business partners about [Brandly] and threatened litigation"; and that "Hebert's conduct further created a hostile work environment for Shield Arms' employees—exposing it to liability." The District Court thus concluded that, "Hebert's tortious conduct and breach of fiduciary duty *made it unlawful* to carry on Shield Arms' business with Hebert as a member." (Emphasis added.) While Hebert had at least summarily denied these allegations, the District Court reasoned that he "did not dispute" his actions therein and therefore, no genuine issue of material fact existed.[2]

¶58    Noting that the statute provides two methods to involuntarily dissociate a member, Hebert argues the Legislature made a clear distinction between the basis for each method, and the corresponding process to be followed. Judicial dissociation under § 35-8-803(1)(f), MCA, permits dissociation broadly upon various grounds, including wrongful conduct that materially affects the company, breaching duties to other members, and conduct that makes it "not reasonably practical" to carry on with that member. Hebert argues that, in contrast,

---

[2] The Court utilizes a definition of "unlawful" which means "at least those actions which are contrary to express provisions of law." Opinion, ¶ 22.

summary dissociation based upon a membership vote under § 35-8-803(1)(e), MCA, is a "high bar" that "applies only if [the member's] presence disqualifies the company, as a matter of law, from conducting its business." He argues this "is what the statute literally says," utilizing a diagrammed sentence: it must be [unlawful] [to carry on the company's business] [with the member]. Hebert contends that this cannot mean that summary dissociation is available when the member acts in a way "that the other members think is contrary to good morals," or merely because the member's actions created tort liability for the company and breached a duty to the other members. Hebert thus argues the District Court erred because his alleged breaches of duty, negligent and reckless conduct, and incurrence of potential tort liability do not work as legal disqualification, that is, render it illegal as a matter of law for *the company to continue in business with him as a member*; rather, these are instances of alleged misconduct that are grounds for judicial dissociation under § 35-8-803(1)(f), MCA.

¶59 Hebert further reasons that this distinction is consistent with available judicial relief. A company could obtain, pending litigation to establish a basis for judicial dissociation, a preliminary injunction to protect the status quo and temporarily restrict a member who is engaging in misconduct from the company's management. In contrast, summary dissociation by membership vote is reserved for rare instances where the member must be immediately expelled for the company to legally continue, even if, and while, the basis for and validity of the summary dissociation would continue to be litigated. The Court states that "Hebert fails to address the most obvious features of the subsections: under subsection (e) the high burden is to have a unanimous vote of all members; under (f) a judge decides

29

based on one member's application to the court." Opinion, ¶ 25. To the contrary, this is an integral part of Hebert's argument. But the Court is correct that subsection (e) encompasses situations where "there is an absolute urgency" to remove a member to "bring themselves into compliance with the law." Opinion, ¶ 25. This is precisely Hebert's argument: that this "high bar" involves situations, as quoted in subsection (e), where Hebert's mere membership status—not his past and potential actions—constitutes an illegality. I believe Hebert's arguments are correct, which is further demonstrated as follows.

¶60 "We interpret a statute first by looking to its plain language." *City of Missoula v. Fox*, 2019 MT 250, ¶ 18, 397 Mont. 388, 450 P.3d 898 (quoting *Mont. Sports Shooting Ass'n v. State*, 2008 MT 190, ¶ 11, 344 Mont. 1, 185 P.3d 1003). "When the legislature has not defined a statutory term, we consider the term to have its plain and ordinary meaning." *State v. Alpine Aviation, Inc.*, 2016 MT 283, ¶ 11, 385 Mont. 282, 384 P.3d 1035 (quoting *Giacomelli v. Scottsdale Ins. Co.*, 2009 MT 418, ¶ 18, 354 Mont. 15, 221 P.3d 666). Consequently, I disagree with the District Court's utilization of the broad meanings under § 28-2-701, MCA, a Field Code provision addressing illegal contract provisions, in the context of a uniform act, because it would authorize summary dissociation of a member on the basis of the other membership's assessment of good morals or the "policy of express law," however that phrase would be defined.[3]

---

[3] Further, § 28-2-702, MCA, provides that contracts "are against the policy of the law" if they "have for their object, directly or indirectly, to exempt anyone from responsibility for the person's own fraud, for willful injury to the person or property of another, or for violation of the law, whether willful or negligent." The situation here does not involve such a contract provision.

¶61    Black's Law Dictionary offers a definition of "unlawful" that is more directly tied to the concept of legal disqualification, providing: "that which is contrary to, prohibited, or unauthorized by law; that which is not lawful; the acting contrary to, or in defiance of the law; disobeying or disregarding the law; while necessarily not implying the element of criminality, it is broad enough to include it." *Unlawful, Black's Law Dictionary* (6th ed. 1990). Under these terms, a company's continued operation with a member would need to be "contrary to, prohibited, or unauthorized by law," or "in defiance of the law," including being criminal, to authorize summary dissociation.

¶62    Consistent with such a definition, the other bases for summary dissociation of a member authorized by § 35-8-803(1)(e)(ii)-(iv), MCA, quoted above, include matters that are legally definitive, such as a transfer of a member's interest, the revocation of a corporate member's charter or suspension of its right to conduct business, or dissolution of a partnership member. We look to these adjacent provisions because "[s]tatutory construction is a 'holistic endeavor' and must account for the statute's text, language, structure, and object." *Fox*, ¶ 18 (internal quotations omitted). Under all of these, the basis for dissociation is merely the member's legally definitive status, such as his interest having been transferred, or in the case of a partnership member, that its interest has been dissolved. They have nothing to do with a member's potentially liability-inducing actions, either past or present, or potential breaches of duty, and stand in contrast to the bases for judicial dissociation under subsection (f), including "engaged in wrongful conduct," "willfully or persistently committed a material breach . . . of a duty owed to the company or the other members," or "engaged in conduct" that make it "not reasonably practical to carry on the

31

business with the member." These things, I submit, are representative of what occurred here, and require a judicial dissociation/expulsion order.

¶63    This is supported by the Official Comments to the ULLA, and case precedent cited therein. Regarding the judicial dissociation or expulsion provision, the Comments provide:

> For examples of conduct warranting [a judicial] expulsion order, see *All Saints Univ. of Med. Aruba v. Chilana*, A-2628-09T1, 2012 WL 6652510 (N.J. Super. Ct. App. Div. Dec. 24, 2012) (discussing a pattern of conduct); *Sherwood Park Bus. Ctr., L.L.C. v. Taggart*, 323 P.3d 551, 561 (Or. Ct. App. 2014) (upholding expulsion of a member who "had stolen a large amount of money from [the limited liability company], had intentionally failed to provide financial information, and had made himself unavailable to carry on the business"); *CCD, L.C. v. Millsap*, 116 P.3d 366, 373 (Utah 2005) (holding that a member's "misappropriat[ion of] trust account funds totaling at least $11,540.06 for his personal use" warranted expulsion, where the member's "misconduct continued the pattern of behavior that [had previously] resulted in losses to the company of $625,000 [, where the new misconduct] . . . took place after [the member's] prior wrongdoing had been discovered and after [the limited liability company] had assented to permit [the member] to atone for his misdeeds by fulfilling the terms of the amended operating 138 agreement").

Unif. LLC Act § 602, ¶ 6 (Nat'l Conf. of Comm'rs on Unif. L. 2015). These Comments, which provide examples of the "conduct warranting" judicial expulsion under subsection (f), are inherently in conflict with the Court's rationale positing the remedies under subsections (e) and (f) as "alternative methods" of dissociation, for any purpose listed therein. Further, the cases cited within the Comments involve issues—theft of property, misappropriation, misconduct, a pattern of behavior resulting in company losses—that are similar to those alleged against Hebert here. That these should be subject to judicial expulsion is logical, as they involve legally complex matters which will require factfinding. Such are the remarkably similar claims made against Hebert in this action, as described by

32

the Court, such as breach of fiduciary duty and hostile work environment. *See* Opinion, ¶ 23 ("Hauss [] observed Hebert taking company inventory from the facility without notice, verbally communicating ideas outside company protocol, having strong emotional outbursts that vacillated from yelling to laughing to sadness within hours. Other members observed that Hebert's behavior appeared detached from reality."); Opinion, ¶ 23 ("Hebert's baseless claims . . . constituted slander and tortious interference" and he created a hostile work environment "thus exposing it to liability."). Further, the statutory grounds for which the Act authorizes judicial dissociation are very similar to the reasons employed by the District Court to approve summary dissociation, i.e., that Hebert had made "baseless claims against [Brandly] and his interference with Shield Arms' business relationships" that were "tortious and are contrary to, prohibited, or unauthorized by law," committed a "violation of his duty of care because he engaged in grossly negligent or reckless conduct and duty of good faith and fair dealing when he contacted business partners about [Brandly] and threatened litigation," and "created a hostile work environment for Shield Arms' employees—exposing it to liability." These similarities highlight how the Court has blurred the statutory text, which will seep into our provisions regarding dissolution as well. The Court relies on the different processes attached to each, comparing the unanimous vote of *all* members (subsection (e)), with a petition of just *one* member (subsection (f)). Opinion, ¶ 25. Although the Court cites this difference to minimize the distinction between the conduct needed for each subsection, this difference instead *highlights* the type of conduct necessary for dissociation under each subsection.

¶64 Notably, the Act provides a parallel set of processes for dissolution of the company as a whole. The Official Comments describe the parallel dissolution provision as an "analog" to the judicial dissociation provision. Unif. LLC Act § 602, ¶ 6(C) (Nat'l Conf. of Comm'rs on Unif. L. 2015). Similar to the dissociation provisions, the Act provides that a limited liability company "is dissolved" when an event occurs "that makes it *unlawful* for all or substantially all of the business of the company to be continued." Section 35-8-901(1)(c), MCA (emphasis added). Presumably, the District Court's use of the definition of "unlawful" set forth in § 28-2-701, MCA, in the context of dissociation at issue here would likewise authorize use of that definition for dissolution of the entire company as well. And, presumably, applying the Court's holding—that it became unlawful for the business to continue in the context of the dissociation at issue—would likewise authorize use of that definition for required dissolution and winding up of the entire company as well. Continuing the parallel, the Act authorizes a district court, upon application, to order dissolution of a limited liability company for a variety of other reasons, such as economic infeasibility, becoming not "reasonably practicable" to continue in conformity with the articles of organization, because of a member's conduct, or that the managers are acting in a manner that is "oppressive" or "unfairly prejudicial" to a petitioning member. Section 35-8-902(1)(b), (c), (e), MCA.

¶65 Upon my review of the language and structure of the Act, and employment of these interpretative tools, I would conclude that the District Court, and the Court, broadened the Act's authorization of summary dissociation by improperly expanding the intended definition of "unlawful," and thereby subsumed therein conduct intended to be addressed

34

separately in § 35-8-803(1)(f), MCA, for which judicial dissociation is required. Such an expansion undermines the distinction made by the Legislature. It is conceivable that situations which would render unlawful a member's continued involvement in the company under § 35-8-803(1)(e)(i), MCA, would also provide a basis for judicial dissociation under § 35-8-803(1)(f), MCA. I would hold, however, that § 35-8-803(1)(e)(i), MCA, is addressing situations that are "literally" violative of the law to continue conducting business with the member in question. *See* definition of "unlawful" in *Black's Law Dictionary*, 6th Edition, cited herein ("that which is contrary to, prohibited, or unauthorized by law"). Of course, even given my position, a member or members of SA would not be foreclosed from pursuing judicial dissociation of Hebert from the company.

¶66    I dissent from Issue 1 and reverse that issue. I would not reach Issue 4. I concur with the remaining issues.


/S/ JIM RICE


Chief Justice Cory J. Swanson and Justice James Jeremiah Shea join in the concurring and dissenting Opinion of Justice Jim Rice.

/S/ CORY J. SWANSON
/S/ JAMES JEREMIAH SHEA